**COMMERCIAL MUSIC COMPANY, Inc., d/b/a Austin Phonograph Company, Appellant,**

**v.**

**Tex M. VANZURA, d/b/a Pink Lizard Lounge, et al., Appellees.**

**No. 11639.**

Court of Civil Appeals of Texas.

Austin.

April 16, 1969.

Rehearing Denied May 7, 1969.

Biggers, Baker Lloyd & Carver, Spencer Carver, Dallas, for appellant.

Jones, Blakeslee, Minton, Burton & Fitzgerald, Roy Q. Minton, Sam French, Austin, for appellees.

HUGHES, Justice.

Appellant, Commercial Music Co., Inc., sued Tex M. Vanzura, d/b/a Pink Lizard Lounge, Roy Eazor and Julia Sawyer alleging that it had been unlawfully evicted from premises in Austin, Travis County, formerly leased to Eazor, presently owned by Mrs. Sawyer and presently leased to Vanzura.

In October 1964, the property in suit was owned by Edward J. Haffner who leased it to Eazor for a period of three years with a three year option. These leases provided that the lease could not be as-signed or the premises sublet without the written consent of Lessor.

On May 11, 1966, Eazor executed what is denominated an "Exclusive Concession Lease," the property leased being described as Ray's Lounge at 2610 Guadalupe Street and Roy's Cafe at 2612 Guadalupe Street, Austin, Texas, in favor of appellant. This lease was for a term of five years with an option to renew for one year. The consideration for this lease was stated to be one dollar. It gave Lessee many rights but created few obligations on it. It gave to Lessee " * * * the right, privilege and option of installing and operating all legal coin operated electrical phonographs, amusement devices, and cigarette machines * * *" on the premises. It provided for assignment without the consent of Lessor. It provided that Lessee should pay "a percentage of the gross proceeds" to Lessor. The lease contained many other provisions principally for the protection and benefit of Lessee.

On January 7, 1967, Mrs. Sawyer, who had purchased the property in April, 1965, signed, in blank, the following instrument:

"The Undersigned is Landlord of the premises at 2610–C Guadalupe & 2610–B Guadalupe City of Austin, County of Travis, Texas, and hereby consents to the Concession Lease in favor of Austin Phonograph Company and the above assignment of lease on the premises according to its terms. The Undersigned agrees to notify Austin Phonograph Company of any termination of the lease on the premises or that said lease is sought to be transferred with an option for ten days for Austin Phonograph Company to succeed said lease for the remainder of its term.

EXECUTED THIS THE 7th day of January, 1967

/s/ Julia Sawyer

Julia Sawyer" [1]

___

1. The blank spaces were for insertion of location and date.

On June 29, 1967, Mrs. Sawyer and Vanzura executed a lease on these premises for a period of five years with an option to renew for five years. After the execution of this lease Vanzura refused to use appellant's coin operated machines and installed other machines.

This lease resulted from negotiations between Eazor and Vanzura whereby Vanzura about June 21, 1967, purchased Roy's Lounge from Eazor. It is obvious that this lease was made before the leases from Haffner to Eazor had expired. The effect of this transaction was that the Haffner leases were surrendered by Eazor and it is this conduct by him which appellant contends activated the following provision of its "Exclusive Concession Lease."

"2. It is expressly understood that in the event that the LESSOR herein shall not be the owner of the premises herein leased, and shall hold a lease of the property of which the demised premises are a part, then this sublease is and shall remain subject to all of the terms and conditions of such existing lease to the LESSOR so far as they shall be applicable to the premises herein leased. In the event LESSOR holds a lease on the demised premises herein, LESSOR acknowledges that he has this day granted to LESSEE an assignment thereof to enable LESSEE to succeed to said lease in the event of breach by this LESSOR; abandonment by this LESSOR; the attempted sale or assignment by this LESSOR of said lease or equipment located therein; or upon any of the events specified in said lease as constituting a breach or termination thereof upon the election of the owner. LESSOR warrants and covenants that he shall give written notice to LESSEE ten (10) days in advance of any of said acts or events making effective this Assignment."

Appellant prayed for specific performance of its concession lease, for an injunction and, in the alternative, for damages.

We quote the following from the answer of Mrs. Sawyer:

"The defendant will show that when the instrument described by the plaintiff as a 'landlord's waiver' was presented to her, all of the blanks were in fact still blank and the instrument on its face obviously referred to some other written instrument which did not accompany it. Thereafter, and prior to signing the instrument, she called Mr. Pete Martinez, the man who was then manager of Austin Phonograph Company, and asked him to explain exactly what the so-called 'landlord's waiver' and the other written instrument to which the 'landlord's waiver' referred provided and how they would affect the defendant, Julia Sawyer. Mr. Martinez at first stated that it was only a technical requirement necessary before Austin Phonograph could loan any money to Mr. Eazor. Upon being pressed further Mr. Martinez explained that the 'landlord's waiver' and the other written of the landlord's lien as to Austin Phonograph Company equipment and would enable Austin Phonograph to recover their machines even if the tenant defaulted and Mrs. Sawyer exercised her landlord's lien in an effort to get rent money collected. The defendant would show that relying on this explanation she thereafter signed the 'landlord's waiver' not realizing that the instrument which she signed had any significance other that which had been represented to her by the plaintiff agent and employee, Pete Martinez, and the defendant would further show that the plaintiff well knew that the defendant was mistaken in these facts concerning the written instruments.

III.

The defendant will show that there was no consideration for her execution of the so-called 'landlord's waiver' and that, on the contrary, no consideration was even discussed, it being understood that she would sign the instrument as a favor to Mr. Eazor."

Trial was non-jury. Judgment was rendered that appellant take nothing by its suit. There are no findings of fact or conclusions of law.

Appellant has four points three of which are predicated on the validity of the so-called "landlord's waiver," the other point being in rebuttal of Vanzura's plea of bona fide purchaser.

In our opinion it is unnecessary for us to discuss any of appellant's points for the reason that judgment for appellees was properly based on the pleading and evidence that the "landlord's waiver" was invalid being procured by misrepresentation by appellant.

We quote the following testimony of Mrs. Sawyer regarding her execution of the "landlord's waiver:"

"Q How did you get that instrument prior to the time that you signed it?

A Well, sir, it was in my mailbox.

Q All right.

A And, in fact, I was informed by Mr. Martinez several times and by Roy asking me to sign it. I had it for about four days before I signed it.

Q All right. Did you call up Mr. Martinez and ask him to explain to you what the meaning of that instrument was?

A Yes, sir.

Q Were you able to tell from reading the instrument that it also referred to some other instrument?

A No, sir. I didn't—this is all they gave me.

Q I understand that. But were you able to tell from looking at it that it referred to some other instrument that you did not have?

A It says down here, but I didn't— yes, sir. It does say that.

Q But you did not have that?

A I didn't have it.

Q Did they send you this exclusive concession lease which is presently marked Plaintiff's Exhibit 2 when they sent you this?

A No, sir. They didn't.

Q All right. So at the time you called Mr. Martinez, you did not have either the original nor any copy of the so-called exclusive concession lease. Is that correct?

A No, sir. I didn't have it.

Q All right. Mrs. Sawyer, when you called Mr. Martinez and asked him about the instrument, what did you ask him specifically? What did you tell him you wanted to know?

A Well, I asked him to explain this and I couldn't see *what* I had to sign something like this.

Q All right. What did he at first tell you when you asked that? What did he at first say was the meaning of it?

A Well, at first, he said it actually was nothing. And that it was just a, oh, it was a—oh, I am trying to remember exactly what he said but I could explain it in my own words. That it would give him, in case Roy would falter, that this is a regulation or something about their company. I am trying—I don't know exactly, but I am trying to explain it how it really was— that they would have them to— it was required by their company if they were going to loan money out to tenants, they like the landlord to sign in case the tenant would falter or so in case I foreclosed, in other words, on Mr. Eazor, that

they could come in and take their fixtures or their machines and get it out of there or it would give them the right to come in.

Q Did he explain what 'landlord's waiver' meant? What it was you were waiving, when you refer to it as a landlord's waiver?

A Well, in other words, I asked him, I said 'What does—what effect does that have on me?' He said, 'Well, nothing.' In other words, he says, 'The only thing is that we could come in and whatever belongs to us, that you will let us in to get what belongs to us.'

\* \* \* \* \* \*

Q All right. Did Mr. Martinez explain anything else to you? Did he go into it any more than just what you've already told the Court? That is, that it was a waiver of your landlord's lien?

A No. He just said it would just give them the right to come in and get what belongs to them.

Q All right. Now, based on what Mr. Martinez told you, did you sign that instrument?

A Well, yes, sir, I did. I believe that I had faith that what he said was true.

Q All right.

A But I find out now, it isn't.

Q Did you receive any money for signing this instrument?

A No, sir. No, sir.

Q Was there even any discussion of their paying you anything?

A No, sir.

Q Did you state to Mr. Martinez that—was there some conversation with Mr. Martinez that Roy needed it and if he needed it, you'd do it as a favor to him? Was that generally the conversation?

A Yes, sir. Just to help Roy where he could get that loan from the Austin Phonograph."

Mr. Roy Eazor testified regarding the "landlord's waiver:"

"Q Tell the Judge the circumstances surrounding the time when you first saw this piece of paper and what its condition was then and what the people told you who gave it to you.

A Well, the first time I seen this piece of paper, it didn't have anything on it. I mean, the lines were all blank. There was nothing typed in. And Mr. Martinez was the manager of Austin Phonograph at that time, handling all their business. And I was going to borrow some money from them and make a deal with them so I could get this club completely set up the way I wanted to do it. And so he said—

Q Which club are you talking about?

A The Waterloo Club.

Q All right, sir. Go ahead.

A But at the time, he told me that they had had some trouble with Mrs. Sawyer on a place over on the east side and that she had padlocked it and wouldn't let them get their stuff out. And from now on, in order to secure themselves and make them—let them have their way of getting their stuff out in case something really happened to me and that nature, why, they were going to insist on having this landlord's waiver signed. So I took it

up blank and put it in Mrs. Sawyer's mailbox and just left it there.

Q   All right. Did Mr. Martinez explain to you what effect this would have on Mrs. Sawyer so that you could explain this to her if you saw her?

A   He told me that—he told me that there wasn't nothing to it. He said, it's strictly a fact to protect them to get their equipment out of there

in case something was to happen in a foreclosure, or something of that nature.

*    *    *    *    *    *

Q   Did you, in fact, pass any of that information on to Mrs. Sawyer or did you just leave it in her box as the testimony shows?

A   The reason I left it in her box, she wasn't at home.

Q   All right.

A   I talked to her on the telephone later.

Q   Did you give her the explanation of Mr. Martinez?

A   I told her what Mr. Martinez told me. That it was just a matter that they needed something that they would be able to get their equipment out of there in case something should happen like a foreclosure. I understood she had some trouble with them over on the east side where she had padlocked the place and wouldn't let them have nothing."

■  It is our opinion that this testimony is sufficient under the pleadings to sustain the implied holding of the trial court that the "landlord's waiver" was procured from Mrs. Sawyer by false representations of appellant.

■  If there is any defect in the pleading of Mrs. Sawyer either of form or substance it is waived since no exception was made to it. Rule 90, Texas Rules of Civil Procedure. Also, the issue of fraud, if not embraced in the pleading of Mrs. Sawyer, was tried by implied consent since no objection was made to the admission of the testimony on this point some of which we have quoted herein.

In B and B Vending Company v. Ducharme, 349 S.W.2d 630, Tex.Civ.App. Dallas, writ ref. n. r. e. (1961) and Hancock v. Bradshaw, 350 S.W.2d 955, Tex.Civ. App. Amarillo, n. w. h. (1961) instruments which seem to be very similar to the "Exclusive Concession Lease" before us were held to be licenses only and not a leasehold estate. If so, then they are revocable at the will of the licensor. See Joseph v. Sheriff's Association, 430 S.W.2d 700, Tex.Civ.App. Austin, n. w. h. (1968).

■  It is not necessary that we determine whether the "Exclusive Concession Lease" is a license only. We do say that it is an instrument which should be construed very strictly against the "Lessee." It is so drawn as to trap tenants into forfeiting their leases. Here, if appellant is correct, the tenant committed an act of forfeiture when he executed the "Exclusive Concession Lease" since his lease expressly provided that no sublease could be made without the written consent of the landowner.

When this instrument was executed and placed of record it, if it conveys an interest in the land, created a cloud on the owner's title for the reason that by its terms it extended beyond the expiration date of the owner's leases to Eazor. This "Exclusive Concession Lease" is so full of rights, privileges and options for the "Lessee" and so devoid of obligations on his part and of benefits to the "Lessor" that it violates all principles of fairness.

We affirm the judgment of the trial court.

Affirmed.